# A. G. MATHEWS v. CHICAGO & NORTH WESTERN RAILWAY COMPANY.[1]

March 20, 1925.

No. 24,279.

**On rebuttal, proper to exclude confirmatory evidence of initial evidence.**

1. Plaintiff, attempting to show the cause of a boiler explosion, offered proof as part of his case in chief of certain defects in the fire box. On rebuttal, it was proper to exclude further evidence of such defects which went only in confirmation of the original evidence thereof.

**Offer of evidence to rebut that as to cause of explosion properly excluded, when it did not indicate causal connection.**

2. On its part, defendant proved that the explosion was undoubtedly due to a burn in the crown sheet. An offer of evidence in rebuttal *held* properly excluded, because it did not indicate any causal connection between the defect sought to be proved and the burning of the crown sheet or the explosion.

**Res ipsa loquitur inapplicable in action for wrongful death when circumstances indicated negligence of decedent.**

3. The rule res ipsa loquitur is not applicable in an action to recover damages for the death of an engineer caused by the explosion of the boiler of a locomotive in his charge—the circumstances indicating his negligence as the agency of causation as much or more than they do that of the defendant.

*Headnote 1.  See Trial, 38 Cyc. p. 1356.
Headnote 2.  See Trial, 38 Cyc. p. 1333.
Headnote 3.  See Master and Servant, 26 Cyc. p. 1412.

Action in the district court for Lyon county by the special administrator of S. E. Schaal, to recover $40,000.  The case was tried before Gislason, J., and a jury which returned a verdict in favor of defendant.  Plaintiff appealed from an order denying his motion for a new trial.  Affirmed.

[1]Reported in 202 N. W. 896.

*Tom Davis, Ernest A. Michel* and *Charles De Rue*, for appellant.
*Brown, Somsen & Sawyer*, for respondent.

STONE, J.

Action under the Federal Liability and Boiler Inspection Acts to recover damages for the death of Stough E. Schaal, a locomotive engineer who lost his life July 14, 1923, by the explosion of the boiler of the locomotive of which he was in charge. After a verdict for defendant, plaintiff appeals from the order denying a new trial. The right to a new trial, if it exists, is referable to errors of law. A somewhat detailed statement of facts is necessary to an understanding of the issues here.

The engine was pulling an eastward bound interstate freight train and the explosion occurred some five minutes after its arrival at Belle Plaine, Iowa. The engine was of the Mikado type, comparatively new, constructed for and performing heavy freight duty. The explosion tore the boiler from the frame and trucks and projected it directly forward about 150 feet. The crown sheet or roof of the firebox was torn downward and out and left behind on the trailer frame.

The rear of a locomotive boiler is a double walled affair, the firebox being a built-in compartment—in this case about 6 feet high, 8 long and 5 wide. At the front is the flue sheet and on the sides and rear end double walls, a few inches apart and tied together by stay bolts, around which and between the inner and outer shells the water constantly circulates. At the bottom, completely encircling the firebox, is the mud ring, a massive sill to which are fastened and from which rise upward the inner and outer shells.

The crown sheet, in this case, was attached to the tops of the side sheets by longitudinal autogenous welds from which it curved upward and inward into a flat arch. At the rear end, it joined the inner shell of the "back head" and in front, the top of the flue sheet. The crown sheet was tied to the roof of the boiler by radial stays which, like the stay bolts on the sides, were at the firebox end spaced at regular intervals of 4 inches. There were some 580 radial

stays alone. The firebox ends of the stays and radials were threaded into and through the sheets and the heads riveted.

Rising upward and backward at something like a 45 degree angle from a point below and back of the flue sheet was a transverse wall or arch of brick. Its upper end was below a line drawn transversely across the lower side of the crown sheet and just forward of its center. The purpose was to deflect the flame and heat upward and backward against the crown sheet and along under it into the flues.

Plaintiff's initial evidence of negligence was in sum and effect as follows: The evening before, an inspector and repairman found the following: (1) Water oozing through the crown sheet around the heads of about 8 or 10 radial stays. They were "close to the flue sheet in the center * * * towards the front end." (2) The welded side seams "had seven or eight pinholes in them." (3) There was a crack below the flue sheet on the left side and a welded patch on the left front corner on the mud ring through which there was a leak.

Each of these leaks was repaired by the mechanic who testified concerning them. He "got the stays fixed alright and the pinholes fixed alright and the pinholes in the weld in the bottom and where the crown sheet was welded to the side sheets." Such leaks are common because of the extreme thermal changes to which the structure is subjected and no way has been found to prevent them.

Another witness for plaintiff testified that generally these defects indicated "poor workmanship." Upon being asked whether they "would add to the weakness of the crown sheet," his reply was: "It would add to the weakness of the firebox." His final conclusion was this: "In my opinion these leaks would weaken the firebox." He would have "pulled the engine out of service until properly welded * * * it was not in proper condition to operate * * * because of the weakness of the firebox by those leaks." There was other evidence for plaintiff which if believed would have warranted the conclusion that, a few minutes before the explosion, the boiler was foaming but that the water glass and gauge cocks were free from obstruction and indicated at least 9 inches of water

over the front and higher end of the crown sheet. This testimony was so self-characterized as to relieve the jury from the necessity of believing it. There was no fusible plug, but its absence was not considered noteworthy by counsel for plaintiff,—apparently with good cause. See Baltimore & O. Ry. Co. v. Groeger, 266 U. S. 521, 45 Sup. Ct. 169, 69 L. ed. 164. The evidence, pro and con, of a thin layer of scale on the crown sheet is immaterial to the issues on this appeal.

During all of plaintiff's case in chief, the crown sheet was in the court room but counsel, as was their privilege, rested the case without offering it in evidence. For defendant it was immediately introduced. At the front end, the top of the crown sheet was 4¾ inches higher than at the rear, so that, if the water lowered and exposed any portion of the crown sheet, the exposure would begin at the front end and extend backward and downward as the process continued. The portion thus progressively exposed would be, roughly, in the shape of an isosceles triangle, with its base at the front.

Defendant's whole purpose was to show that the water fell so as thus to expose a considerable portion of the crown sheet. Its present appearance, as we get it from the photographs and the testimony, is very persuasive of that view. There is a triangle of freshly burned iron with a base of about 36 inches and its peak some 44 inches rearward from the front and on the crest of the crown sheet. In the center of the burned area, the metal has been heated into a soft and leathery state. Through this point an irregular hole was torn. The force was downward. There is no other portion of crown or side sheets disclosing such a phenomenon. Aside from the triangle, there was no burned iron in the crown or side sheets. A significant fact is that the spot which seems to have suffered the most burning and through which the initial burst seems to have occurred was at the point of maximum heat over the brick-deflecting arch.

Returning now to the enumerated defects brought out by plaintiff's evidence, there was nothing to indicate that any one of them contributed to the explosion. The autogenous welds at the junction of crown and side sheets show no evidence of burned metal or an

initial or any outward break through the seam. One side sheet was torn from the crown sheet along the weld as neatly as paper is torn by hand, without any bending of the torn edges. The same is true of the other side except that here a portion of the crown sheet, about 14 inches wide and 32 inches long, was held by the autogenous weld, torn out of the crown and left on the side sheet. At the front end, the crown sheet tore away part of the flue sheet to which it was fastened.

There is no evidence of burned iron other than in the triangular space and that contains the only indication of an *initial* weakness and consequent giving way under boiler pressure. The ends of the radial stays which had projected through the triangle had been softened by burning. No other radial stays or bolts throughout the whole area of crown sheet and side sheets were in that condition. The physical facts come near to demonstrating that the burning of the crown sheet caused the explosion.

Some of the leaky stays may have been in the burned area. This is not important because such a leak in a cold boiler does not indicate danger. It would take a good many, and bad ones, in a confined area, to be of present importance. On this point, an expert witness for plaintiff testified that "with the expansion from the heat and the cooling off when the fire is knocked out, * * * leaks develop, no matter how good the construction is. * * * Those leaks are unavoidable. * * * It is expansion and contraction."

1. On rebuttal, the crown sheet having been put in evidence by defendant and subjected to much explanation, particularly as to the persuasive significance of the triangle of burned iron, plaintiff called a local blacksmith and attempted to qualify him as an expert in welding and then asked: "Whether or not that is a perfect or an imperfect weld." An objection was sustained on the ground that the question was not proper in rebuttal. After argument, the court's view was unchanged and plaintiff offered to show "that the welding in question (between crown and side sheets), is defective and insecure and now asks the court to allow plaintiff to show this as a part of its case in rebuttal." Again the objection was sustained and upon the resulting assignment of error is placed plaintiff's main argument for reversal.

While ordinarily we prefer more liberal rulings on such matters, we find no ground for just criticism of the one under attack. As part of plaintiff's case in chief, there was some proof concerning the supposed presence of scale and mud. In, addition there was proof of the defects already referred to, including the "pinhole" leaks through the autogenous welds. A full and candid presentation of the case for plaintiff might easily have appeared to the court as requiring the inclusion of the crown sheet as evidence. In any event, it was certainly within the court's discretion to require plaintiff to develop his case fully to start with, and, having gone over the alleged defects somewhat in detail, it is clear that it was proper to prevent a reopening of the same subject matter in rebuttal. Trial judges have to conduct orderly inquiries rather than mere games. The duty of ordering the course of a trial is difficult and important and the trial judge has a discretion commensurate with the difficulty and importance of his task.

Rebuttal evidence properly is that which explains away, contradicts or otherwise refutes the defendant's evidence "by any process which consists merely in diminishing or negativing its force." 1 Greenleaf, Ev. (16 ed.) 600. It does not permit mere repetition of evidence in chief (Nelson v. Farrish, 143 Minn. 368, 173 N. W. 715), nor simple "confirmation of the original case," the purpose being "to cut down the case on the part of the defense and not to confirm that of the prosecution. Minnesota & D. C. Co. v. C. & N. W. Ry. Co. 108 Minn. 470, 122 N. W. 493. It is not good practice to permit witnesses merely to reiterate their testimony under guise of rebuttal. People v. Van Ewan, 111 Cal. 144, 43 Pac. 520. It is just as improper to offer testimony of new witnesses merely in confirmation of the case in chief and distinct from that which meets the proof for defendant, unless the case is one of those where proper practice permits plaintiff to rest on making a prima facie case and later to introduce additional as well as rebutting testimony. Where as here a plaintiff attempts more than a prima facie showing to start with, it is sound discretion and ordinarily sound sense also to require the case to be fully developed, and, in the absence of cause, to prevent a reopening of the main case under the guise of rebuttal. Clients

will not be penalized for inadvertence of counsel because judges are quick, and will remain so, to adjust rules of procedure to the requirements of justice. This record presents no failure in that regard.

2. There is another and equally fatal objection to the proffered testimony, for there is nothing in question nor offer that indicates materiality. Neither predicts a showing that the defect inquired about could have contributed to the explosion. We would have to ignore even elementary knowledge of thermodynamics to avoid the conclusion that, however it was brought about, the burning of the crown sheet was the cause of this catastrophe. As counsel for plaintiff frankly admit: "The cause of the explosion was the letting go of a large chunk of the crown sheet at one time." Their claim, as stated by themselves, was "that the burn in the crown sheet was due to the fact that mud and scale had accumulated thereon in such quantities that the burn followed, and that it was a so-called mud and scale burn." Aside from its implied negation by those statements, to say that the autogenous joints connecting crown and side sheets were in any way agencies of causation would ignore the now conclusively established physical facts. It is inconceivable how a pinhole leak in either of the autogenous welds, both of which were fully 20 inches from the nearest point of the burned triangle and 30 inches from the point of initial burst through the crown sheet, could have made any contribution whatsoever to the explosion, except that when it occurred the crown was torn from the side sheets, along the major portion of its perimeter, at the welded seams.

But, ignoring all that, it remains that neither question nor offer of proof suggested causal connection between the defects sought to be proved and the explosion. For that reason alone, the evidence was properly excluded. Either by question or offer of proof, materiality must be shown. Knatvold v. Wilkinson, 83 Minn. 265, 86 N. W. 99; Flick v. Ellis-Hall Co. 138 Minn. 364, 165 N. W. 135. An offer of proof is unavailing unless it "be full enough to enable the court to see that it is material." National Citizens Bank of Mankato v. Thro, 110 Minn. 169, 124 N. W. 965; Good v. Henert, 114 Minn. 393, 131 N. W. 466.

3. The only other assignment of error requiring consideration is one attempting to invoke the res ipsa loquitur rule. It is not applicable. The locomotive was in charge of the deceased. He was responsible for its safety and had no higher duty in its operation than to maintain at all hazards a sufficiently high water level in the boiler. If, in fact, it was not maintained (the jury concluded that it was not), there is no way of removing or lightening the responsibility of the deceased. The fact that the fireman, to whom also the accident resulted fatally, had a responsibility in that respect does not minimize that of Mr. Schaal whose duty was primary, within the principle of Davis v. Kennedy, 266 U. S. 147, 45 Sup. Ct. 33, 69 L. ed. 99.

The weight of authority is that boiler explosions do not speak for themselves in proof of negligence. Banner Laundry Co. v. Great Eastern Casualty Co. 148 Minn. 29, 180 N. W. 997. This court is committed to the minority view that in a proper case the res ipsa rule is applicable. Kleinman v. Banner Laundry Co. 150 Minn. 515, 186 N. W. 123, 23 A. L. R. 479. But it is not the kind or character of an instrument of injury that brings the rule into operation. The physical cause of injury and attendant circumstances must be such that in their very nature they carry "a strong inherent probability of negligence" (Annotation, L. R. A. 1917E, 49), on the part of the one' sought to be charged.

The rule cannot apply, if (as here) the accident itself is as suggestive of some other cause as it is of the negligence of the defendant. It cannot operate in favor of one whose own neglect of duty is within the realm of reasonable possibility as the agency of causation. The circumstances must exclude any reasonable probability that the fault of the one seeking to invoke it contributed to the result of which he complains. So, as a practical matter, the instrument of causation must have been at the time being in the control of the one sought to be charged with negligence. "More precisely, the doctrine * * * asserts that whenever a thing which produced an injury is shown to have been *under the control and management* of the defendant, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the

fact of the injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of an explanation by the defendant tending to show that the injury was not due to his want of care." 20 R. C. L. 187. Mr. Dunnell uses the same language in stating the rule of our decisions. Dunnell, Minn. Dig. § 7044. So in the Kleinman case, the other elements being present, the rule was applied because "the defendant laundry company owned the boiler and had exclusive charge of its management and operation." And in Narbonne v. Storer, 121 Minn. 505 (507), 141 N. W. 835, a landlord escaped liability for water damage because the "pipes and fixtures" were not shown to be under his control. But as against brakemen, railway companies have the control of draw-bars. Wiles v. G. N. Ry. Co. 125 Minn. 348, 147 N. W. 427. (Reversed on other grounds, 240 U. S. 444, 36 Sup. Ct. 406, 60 L. ed. 732.) In that case is emphasized the statement of Dean Wigmore that both inspection and user must have been at the time of the injury in the control of the party to be charged. That of course implies the exclusion from control, at least to any extent making possible his contribution to the injury of the person on whose behalf recovery is sought, a conclusion arising also from the learned author's next statement that "the injurious occurrence or condition must have happened irrespective of any voluntary action at the time by the party injured." If in this case we lay aside the burned crown sheet and all its implications, we still have the fact that Mr. Schaal was at the time being in control and responsible for the *safe use* of the boiler. That alone is an insurmountable obstacle to the application of the res ipsa rule. Legally, it prevents the thing speaking for itself in proof of negligence.

The initial presumption that the deceased was free from negligence is not lost sight of. The absolute duty to furnish a safe boiler, put upon defendant by the act of Congress, and the accompanying task of adequate inspection have also been kept in mind. Such considerations import no amendment of rules of evidence and do not give the injured person or his representative the right to have negligence inferred against another under the rule res ipsa loquitur in the absence of its conventional setting. The issues of fact were

fairly submitted to the jury and determined adversely to plaintiff. The evidence was persuasive of a fault of decedent as the cause of the explosion and that the blame of others, if any, was negligible. The jury took that view and the record affords "no justification for a comparison of negligence, nor the apportioning of their effects." G. N. Ry. Co. v. Wiles, 240 U. S. 444, 36 Sup. Ct. 406, 60 L. ed. 732.

Order affirmed.